**In re SMITH GARDNER, SECURITIES LITIGATION**

**No. 00–8547–CIV.**

United States District Court,
S.D. Florida.

March 19, 2002.

Robert Randall Adler, Kenneth J. Vianale, Milberg, Weiss, Bershad, Hynes & Lerach, Boca Raton, FL, for Plaintiff.

Stanley Howard Wakshlag, Brian Paul Miller, Akerman, Senterfitt & Eidson, Miami, FL, for Defendants.

*ORDER GRANTING DEFENDANT'S MOTION TO DISMISS*

GARBER, United States Magistrate Judge.

THIS CAUSE came before the Court upon the Report and Recommendation is-sued by Magistrate Judge Barry L. Garber on February 5, 2002. Therein, Magistrate Judge Garber recommends that the defendant's motion to dismiss the plaintiff's consolidated amended class action complaint be granted without prejudice. Having conducted a *de novo* review of this matter, including consideration of the plaintiff's objections to the Report and Recommendation and the defendant's response thereto, it is

ORDERED AND ADJUDGED that Magistrate Judge Garber's Report and Recommendation is AFFIRMED and ADOPTED in its entirety. Accordingly, it is further

ORDERED AND ADJUDGED that the defendant's motion to dismiss the consolidated amended class action complaint (D.E.# 20) is GRANTED without prejudice. The plaintiff has fifteen days from the date of this order to file an amended pleading that cures the defects set forth in Magistrate Judge Garber's Report and Recommendation.

## *REPORT AND RECOMMENDATION*

THIS CAUSE is before the Court on Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint [DE# 20] pursuant to an Order of Reference by the Honorable Shelby Highsmith. The Court has carefully reviewed the pertinent portions of the record and is duly advised in the premises. The following Report and Recommendation is hereby submitted. For the reasons that follow, the Court recommends that the Motion to Dismiss be granted.

## *BACKGROUND*

This is a securities class action brought under Section 10(b) of the Securities Ex-

change Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), Section 20(a), 15 U.S.C. § 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5. Plaintiffs bring this action against Defendants Smith Gardner & Associates Inc. ("Smith Gardner"), Gary G. Hegna ("Hegna"), Martin K. Weinbaum ("Weinbaum"), Allan Gardner ("Gardner") and Wilburn Smith ("Smith").[1] Plaintiffs assert this claim as a class action, on behalf of a class of all persons who purchased the common stock of Smith Gardner during the period beginning February 3, 2000 through and including June 16, 2000.

For the purposes of the instant Motion to Dismiss, the Court construes the facts as alleged by Plaintiffs in the Consolidated Amended Class Action Complaint (the "Amended Complaint") as true. Defendant Smith Gardner designs, sells and implements mail order and cataloguing system software packages to mail order retailers. *See* Amended Complaint ¶ 28. Smith Gardner modifies or customizes the software as an option to the customer. *See id.* During the fourth quarter of 1999, Smith Gardner contracted to provide a $2 million computer system to ToyTime, Inc. d/b/a ToyTime.com ("ToyTime"), a start-up internet company. *See id.* ¶ 37. ToyTime sold toys and baby items through the internet and through mail order catalogues. *See id.* ¶ 38. ToyTime began having financial difficulties prior to the Christmas holiday season of 1999. *See id.* Its final catalogue was issued in January, 2000. *See id.* By April, 2000, ToyTime was out of money.

*See id.* ToyTime discontinued its operations by early May of 2000. *See id.* ToyTime held informal meetings and discussions with its creditors, including Smith Gardner, on May 24, 2000. *See id.* Subsequently, involuntary bankruptcy proceedings were initiated on July 3, 2000. *See id.*

The allegedly fraudulent scheme at issue in this case is that Smith Gardner improperly and prematurely recognized revenue from its sale of software to ToyTime. According to Plaintiffs, the computer system which Smith Gardner contracted to provide to ToyTime was installed in January and February of 2000. *See id.* ¶ 39. Plaintiffs assert that Defendants recorded revenue from the ToyTime transaction as of December 31, 1999, prematurely recognizing revenue of approximately $2 million during the fourth quarter of 1999. *See id.* Plaintiffs allege that in recognizing the aforementioned revenue before the software was installed and customized, Defendants violated the Generally Accepted Accounting Principles ("GAAP"). *See id.* ¶¶ 30–39.

**The Allegedly Materially False and Misleading Statements and Supporting Facts**

In support of their securities fraud claims, Plaintiffs specify the following allegedly false and misleading statements by Defendants.

(1) A press release issued by Smith Gardner on February 3, 2000, the date the class period began. Said press release announced record fourth quarter

---

1. As stated in Plaintiffs' Consolidated Amended Class Action Complaint, Gary G. Hegna is Chief Executive Officer, President and Chairman of the Board of Directors of Smith Gardner; Martin K. Weinbaum is Chief Financial Officer, Vice–President—Finance and the Principal Financial and Accounting Officer of Smith Gardner; Allan Gardner, a co-founder and namesake of Smith Gardner is the com-

pany's Chief Technology Officer and served as a Director of Smith Gardner during the class period of February 3, 2000 to June 16, 2000; Wilburn Smith, a co-founder and namesake of Smith Gardner, is the company's Executive Vice President for Sales and served as a Director throughout the class period of February 3, 2000 to June 16, 2000.

and profitable year-end 1999 results. Smith Gardner reported pro forma and historical net income for the fourth quarter ended December 31, 1999 was $1.0 million, compared to a pro forma net income of $439,000 for the fourth quarter of 1998 and an historical net income of $601,000 for the fourth quarter of 1998. The company reported revenue as $46.6 million for the year ended December 31, 1999, an increase of 38% from revenue of $33.7 million for the year ended December 31, 1998. *See id.* ¶ 40. Commenting on these results, Defendant Hegna stated that Smith Gardner had completed a record quarter and a record year. He added that fourth quarter sales were "dominated by Internet pure-play companies" including ToyTime.com. *See id.*

As a result, on February 4, 2000, Deutsche Banc Alex Brown issued an analyst report on Smith Gardner, maintaining a "strong buy" on the company, and estimating its long term growth rate at 40%. *See id.* ¶ 41.

(2) On March 29, 2000, Smith Gardner filed its 1999 Form 10–K with the Securities and Exchange Commission. Plaintiffs assert that the financial statements and other financial information contained within this document were substantially identical to those which were presented in the February 3, 2000 press release. *See id.* ¶ 43. Plaintiffs further assert that Smith Gardner's 1999 financial statements failed to reflect that a $1.5 million receivable from ToyTime was not likely collectible through a charge to income. *See id.* ¶ 47.

(3) On April 26, 2000, Smith Gardner issued a press release announcing record revenue for the first quarter ended March 31, 2000. *See id.* ¶ 56. The company stated that revenues for the first quarter ended March 31, 2000 were $12.9 million, an increase of 43% from

revenues of $9.1 million for the first quarter of 1999. *See id.*

Also on April 26, 2000, Alex Brown issued an analyst report on Smith Gardner, raising its revenue and earnings forecast for the year, and maintaining its "strong buy" rating on the company. *See id.* ¶ 57. Alex Brown stated that it was raising its 2000 estimates by $0.01 to $0.48, based on increased revenues. *See id.*

(4) On or about May 10, 2000, Smith Gardner filed its first quarter 2000 Form 10–Q with the Securities and Exchange Commission. Plaintiffs assert that the financial statements and other financial information contained within these documents were substantially identical to those which were presented in the April 26, 2000 press release, and that they failed to disclose, in violation of the GAAP, that a due balance of approximately 1.5 million was owed to Smith Gardner by ToyTime. *See id.* ¶¶ 59–62.

(5) Defendants made additional allegedly misleading statements on May 25, 2000, one day after an informal meeting of ToyTime's creditors. *See id.* ¶¶ 45, 63. At said meeting, ToyTime disclosed its dire financial condition and laid out a plan for a sale of its assets outside of bankruptcy. *See id.* ¶ 45. In a press release issued on May 25, 2000, Smith Gardner disclosed that it was taking a write-down of $1.2 million because one of its clients was experiencing cash flow difficulties. *See id.* ¶ 46. Plaintiffs assert that the press release failed to disclose Smith Gardner's improper recognition of $2 million in revenue. *See id.* ¶ 66.

Following the May 25, 2000 press release, the price of Smith Gardner's stock dropped 32% from 9⁹⁄₁₆ to 6¼. *See id.* On June 16, 2000, Smith Gardner issued a press release announcing preliminary ex-

pectations for the second quarter of fiscal 2000. The press release stated that second quarter results would be adversely impacted by several factors, including the reduction of approximately $.05 per share relating to an additional accounts receivable reserve for one of its customers. *See id.* ¶ 67. Also on June 16, 2000, Alex Brown stated that the movement of the material sales revenue from the second quarter to the third quarter impacted Smith Gardner's dot-com startups, and was due to the difficulty of some of the dot-com customers in obtaining financing. *See id.* ¶ 68. Consequently, Smith Gardner's stock price plunged 32% from 71/4 to 4¹⁵⁄₁₆. *See id.* ¶ 69.

Plaintiffs contend that the statements set forth above were false and misleading, and masked Smith Gardner's true financial condition. As noted above, Plaintiffs allege that these statements were false and misleading because Defendants inflated reported revenue by prematurely recognizing revenue of $2 million in connection with its contract with ToyTime, thus violating GAAP and its own stated accounting policy. As a consequence, Plaintiffs allege, Defendants caused Smith Gardner's financial statements to reflect approximately $1.5 million of an uncollectible receivable as a valuable asset. Additionally, Plaintiffs assert that Defendants failed to disclose that more than 16% of the company's receivables represented a balance from one customer, ToyTime, and that this failure to disclose violated GAAP. Plaintiffs further allege that Defendants either knew or were severely reckless in disregarding that Smith Gardner would not receive full payment from ToyTime, based on the unpaid receivable balance of $1.5 million.

### STANDARD OF REVIEW

#### A. Motion to Dismiss

For purposes of a motion to dismiss, a court must view the allegations of the complaint in the light most favorable to the plaintiff, consider the allegations of the complaint as true, and accept all reasonable inferences therefrom. Fed.R.Civ.P. 12(b)(6); *see also Jackson v. Okaloosa County, Fla.,* 21 F.3d 1531, 1534 (11th Cir.1994). It is well-settled that a "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Normally, a court must limit its consideration to the pleadings and written instruments attached as exhibits thereto; however, where a complaint alleges violations of securities laws, the court may consider certain other materials, such as documents filed with the Securities and Exchange Commission (the "SEC"). *See Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1276–81 (11th Cir.1999); *Harris v. Ivax Corp.,* 182 F.3d 799, 802 n. 2 (11th Cir.1999); *Cheney v. Cyberguard Corp.,* 2000 WL 1140306, *3 (S.D.Fla. July 31, 2000) ("In a securities fraud case, when deciding a motion to dismiss, the court also 'may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC.'") (citation omitted). In deciding the instant Motion to Dismiss, the Court has considered the allegations of the Consolidated Amended Class Action Complaint, as well as the contents of relevant SEC filings and documents referenced in the Amended Complaint.

#### B. The Securities Exchange Act

Section 10(b) of the Securities Exchange Act imposes liability on any person who uses or employs "in connection with the purchase or sale of any security ... any manipulative or deceptive device or contri-

vance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b); *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 167, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

One of the rules adopted by the SEC, Rule 10(b)–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud.

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

In order to state a claim under § 10(b) and Rule 10b–5, a plaintiff must allege the following: (1) the defendant made misstatements or omissions, (2) of a material fact, (3) with scienter, (4) on which plaintiff relied, (5) that proximately caused plaintiff's injury. *Bryant*, 187 F.3d at 1281; *Ziemba v. Cascade International, Inc.*, 256 F.3d 1194, 1201 (11th Cir.2001); *Cheney*, 2000 WL 1140306, at *3. Under Section 20(a), liability may also be imposed on a "controlling person" where a securities violation is found. *See Brown v. Enstar Group, Inc.*, 84 F.3d 393, 395–97 (11th Cir.1996). A controlling person is one who had "the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws ... and [who had] the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Id.* at 396 (citations omitted).

## C. Federal Rule of Civil Procedure 9(b)

In order to survive a motion to dismiss, Plaintiffs' claims of fraud under § 10(b) and Rule 10b–5 also must satisfy the requirements of Fed.R.Civ.P. 9(b). Rule 9(b) provides:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person shall be averred generally.

Fed.R.Civ.P. 9(b). The Rule will be satisfied if "the complaint sets forth what statements or omissions were made in what documents or oral representation; the time and place of the statements or omissions; who made the statements; the content of the statements and the manner in which they misled the plaintiffs; and what the defendant 'obtained as a consequence of the fraud.'" *Cheney*, 2000 WL 1140306, at *4 (quoting *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir.1997)).

## D. Heightened Pleading Requirements under the Reform Act

The Private Securities Litigation Reform Act of 1995, Pub.L. No. 194–67, 109 Stat. 743, codified at 15 U.S.C. § 78u–4(b) ("PSLRA"), established heightened pleadings requirements for certain private securities actions. *Cheney*, 2000 WL 1140306, at *4–5. If these additional requirements are not met, the Court must dismiss the action. *Id.;* 15 U.S.C. § 78u–4(b)(3). Section 78u–4(b) imposes several requirements. The plaintiff must specify each

statement alleged to have been misleading and the specific reason or reasons why the statement is misleading. 15 U.S.C. § 78u–4(b)(1). In addition, where allegations in a securities complaint are made on information and belief, the complaint must state with particularity all facts on which that belief is formed. *Id.* The plaintiff must also, for each alleged misrepresentation, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u–4(b)(2). The 'required state of mind' in § 78u–4(b)(2) refers to the scienter requirement applicable to the underlying securities fraud claim. *In re Unicapital Corp. Securities Litig.*, 149 F.Supp.2d 1353, 1370 (S.D.Fla.2001) (citation omitted).

The Supreme Court has defined the level of scienter necessary to support a Rule 10b–5 claim as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Eleventh Circuit has clarified this definition to encompass allegations of "severe recklessness." *Bryant*, 187 F.3d at 1282–84 ("a complaint alleging with particularity that a defendant acted with a severely reckless state of mind … suffices to state a claim for civil liability under § 10(b) and Rule 10b–5"); *Echavarri v. Cellstar Corp.*, Case No. 99–1502–CIV–GRAHAM, slip. op. at 10–11 (S.D.Fla. September 28, 2001). The former Fifth Circuit has stated that

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present

a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Broad v. Rockwell International Corp.*, 642 F.2d 929, 961–62 (5th Cir.1981).[2] Therefore, in order to comply with the heightened pleading requirements of the PSLRA, the Amended Complaint must allege how the Defendants acted with severe recklessness in relation to the alleged material misrepresentations and omissions.

### DISCUSSION

Defendants move to dismiss the Complaint on the following grounds: (1) the Complaint fails to allege with particularity all facts on which the allegations are based; (2) there are insufficient facts alleged to suggest a strong inference of scienter; (3) there can be no liability for alleged unadopted statements contained in the analyst reports; (4) the Complaint alleges fraudulent, forward-looking statements which are protected by the Reform Act's safe harbor provision, and; (5) the Complaint's controlling person claim fails because there is no underlying securities fraud violation alleged.

### I. Fraud with Particularity

■ As stated above, Plaintiffs allege that ToyTime contracted to purchase a mail order cataloguing system product from Smith Gardner in December, 1999. Smith Gardner allegedly began the installation in January 2000, and completed the installation in February 2000. *See* Amended Complaint ¶ 39. Plaintiffs further assert that Defendants improperly recognized the revenue from the ToyTime transaction in its 1999 fourth quarter financials. *See id.* Plaintiffs allege that

**2.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

under GAAP, Defendants prematurely recognized the revenue because the software system supplied to ToyTime was customized at the client's specifications. Plaintiffs further allege that Smith Gardner did not receive any money from ToyTime for several months, despite having completed the installation in February 2000, and thus Smith Gardner knew that the receivable was likely not collectible.

Defendants argue that the allegations of the complaint do not satisfy the pleading standard of Fed.R.Civ.P. 9(b) and the PSLRA because they do not "answer critical questions about how the alleged fraud took place and how Plaintiffs discovered that ToyTime was unable to meet its obligations." Defs. Mem. Supp. Mot. Dismiss at 23. Defendants also argue that Plaintiffs offer few specifics as to the details of the software sale to ToyTime or why it was not properly accounted for. See id. Defendants further argue that since the Complaint is pled based on information and belief, Plaintiffs are required to plead all facts on which their information and belief is based, but have failed to do so. See id. at 25. Defendants contend that the Amended Complaint improperly relies on unnamed former employees to substantiate Plaintiffs' allegations. Plaintiffs respond that the Complaint adequately particularizes Defendants' fraud and scienter. In other words, Plaintiffs assert that they have specified the who, what, where, when, how and why of the alleged fraud.

As stated above, it is well settled that Fed.R.Civ.P. 9(b) is satisfied if a complaint alleging a securities fraud claim sets forth what statements or omissions were made in what documents or oral representation, the time and place of the statements or omissions, who made the statements, the content of the statements, the manner in which the statements or omissions misled the plaintiffs, and what the defendants obtained as a result. See In re Sunbeam Securities Litig., 89 F.Supp.2d 1326, 1335 (S.D.Fla.1999). Furthermore, under 15 U.S.C. § 78u–4(b), the plaintiff must specify each statement alleged to have been misleading and the specific reason or reasons why the statement is misleading. See id. at 1336. Thus, in order to plead facts with particularity, "a plaintiff must provide a list of all relevant circumstances in great detail." In re Silicon Graphics Inc. Securities Litig., 183 F.3d 970, 980 (9th Cir. 1999); see also Malin v. Ivax Corp., 17 F.Supp.2d 1345, 1360 (S.D.Fla.1998), aff'd, 226 F.3d 647 (11th Cir.2000).

It is correct that the Amended Complaint sets forth in detail the statements that Plaintiffs allege to be false and misleading. The Amended Complaint also sets forth when the statements were made. It details specific misrepresentations in the February 3, 2000 press release; the December 31, 1999 Form 10–K, filed on March 29, 2000; the April 26, 2000 press release; the March 31, 2000 Form 10–Q, filed May 10, 2000 and the May 25, 2000 press release. The Amended Complaint also sets forth who made these statements. The individual Defendants signed the December 31, 1999 Form 10–K. See Defs. Ex. 23. Defendant Weinbaum signed the March 31, 2000 Form 10–Q. See Pls. Opp'n, Ex. A. With regard to other documents, Defendants do not appear to dispute the applicability of the group pleading doctrine. Under this doctrine, allegations of securities fraud based upon statements in group published information are presumed to be the collective information of corporate officers involved in the day-to-day management of the corporation. See In re Sunbeam Securities Litig., 89 F.Supp.2d at 1340–41. Thus, Plaintiffs need not set forth a specific connection between each individual corporate defendant and every alleged omission or misrepresentation when the allegedly misleading

information is contained in group published information. *See In re Theragenics Corp. Securities Litig.*, 105 F.Supp.2d 1342, 1357 (N.D.Ga.2000) (citation omitted); *In re Criimi Mae, Inc. Securities Litig.*, 94 F.Supp.2d 652, 657 n. 4 (D.Md. 2000). Additionally, the Amended Complaint sets forth what Defendants stood to gain from making the statements. Plaintiffs allege that Defendants' misrepresentations and omissions of material fact helped propel Smith Gardner's common stock to a class period high of approximately $23⅝ per share. In the process, Plaintiffs allege, Defendants sold 270,000 shares of the company's common stock at an average price of $18.22 for proceeds exceeding $4,673,085.00. *See* Amended Complaint ¶ 4.

The remaining issue of how the statements alleged to have been made by Defendants were misleading is more problematic. Defendants argue that Plaintiffs have set forth unsupported allegations concerning the details of the ToyTime transaction and why it was not properly accounted for.

In support of the contention that Defendants improperly recognized revenue of $2 million during the fourth quarter of 1999 in connection with its contract to provide a customized computer system to ToyTime, the Amended Complaint alleges that according to Smith Gardner's Registration Statement, the company "typically received a deposit equal to 25% of the [computer software] system selling price upon the signing of the contract, and an additional 25% prior to the installation of the system." Amended Complaint ¶ 44. The Amended Complaint also states that, as set forth in Smith Gardner's February 3, 2000 press release, 1999 fourth quarter sales were dominated by internet companies, including ToyTime. *See id.* ¶ 40. On May 25, 2000, Smith Gardner disclosed that it was taking a write-down of $1.2 million due to the financial difficulties of one of its customers. *See id.* ¶ 64. However, absent here are the critical supporting facts for Plaintiffs' specific assertion that Smith Gardner recognized $2 million in revenue from the ToyTime contract in the fourth quarter of 1999. As the Amended Complaint itself sets forth, Smith Gardner was involved with a number of internet companies, not just ToyTime.

Also absent are the critical supporting facts that the software system provided to ToyTime was customized. Plaintiffs do assert that according to "a former director of Web Design and Web Programming at Smith Gardner, the installation process alone could take up one year to complete." *Id.* ¶ 29. However, the Complaint offers no specifics as to whether this former employee was involved with the installation of the computer system at issue.

Plaintiffs also allege that after Smith Gardner contracted with ToyTime. "according to a former employee of ToyTime involved with the purchase and installation of the MACS software, the system installation began in January 2000 and was completed in February 2000." *Id.* ¶ 39. This assertion is somewhat more substantive, but is still problematic. Defendants argue that the Amended Complaint is pled based on information and belief, and thus Plaintiffs must plead all facts on which their information and belief is based. Accordingly, Defendants assert, Plaintiffs may not solely rely on unidentified former employees. Plaintiffs counter that they are not required to identify confidential sources and cite to various decisions in support of their position. *See e.g., Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir.2000) (stating that "even if personal sources must be identified, there is no requirement that they be named, provided they are

described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"). Defendants, predictably, cite to competing case law to support the notion that a PSLRA complaint must set forth the source of the information and the reasons for the belief. *See e.g., In re Stephan Co. Securities Litig.*, Case No. 99–6434–Civ–Dimitrouleas, slip op. at 5 (S.D.Fla. Sept. 19, 2001); *In re Sunbeam Securities Litig.*, 89 F.Supp.2d at 1336 n. 4. Even if the Court were to accept Plaintiffs' argument and apply the *Novaks* standard, Plaintiffs still have not adequately described the confidential source in the Amended Complaint to support the probability that a person in that position would possess the information alleged. Plaintiffs do not state the former employee's position or how he or she was involved with the installation of the software. A bare-bones claim that this former employee was "involved with the installation" without another adequate basis for believing Plaintiffs' allegations is insufficient. *See Holmes v. Baker*, 166 F.Supp.2d 1362, 1380–81 (S.D.Fla.2001); *see also In re Republic Services, Inc. Securities Litig.*, 134 F.Supp.2d 1355, 1361 (S.D.Fla.2001) (stating that the plain language of the PSLRA leads to the conclusion that a plaintiff must plead all relevant facts when a complaint is based upon information and belief or the investigation of counsel).

In sum, the Court finds that Plaintiffs have failed to specify the reason or reasons as to how and why the alleged omissions and statements were misleading. On this ground, therefore, the Amended Complaint should be dismissed.

## II. Scienter

In the Complaint, Plaintiffs allege that: (1) Defendants prematurely recognized revenue from the contract with ToyTime in violation of GAAP in order to inflate stock prices and; (2) Defendants knew prior to ToyTime's May, 2000 disclosure of its financial difficulties that it would be unable to collect on the unpaid receivable. Defendants move to dismiss on the grounds that: Plaintiffs fail to allege particular facts regarding Defendants' alleged knowledge of and/or participation in any accounting fraud; allegations of GAAP violations are insufficient to create an inference of scienter; and pleading motive and opportunity is insufficient to give rise to an inference of scienter. Plaintiffs counter that a strong inference of Defendants' scienter can be made based on: Defendants' heavy insider selling during the class period at issue; Defendants' violations of GAAP; the magnitude of the GAAP violations; and the simplicity of certain GAAP violated by Defendants.

As stated above, the PSLRA provides that the "complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). There are two relevant states of mind under the PSLRA. *See Theoharous v. Fong*, 256 F.3d 1219, 1224 (11th Cir.2001). First, for forward looking statements, "the plaintiff must prove that the defendant made the statement with actual knowledge that it was false or misleading." *Id.*; 15 U.S.C. § 78u–5(c)(1)(B)(i). Second, for statements that are not forward-looking, "the plaintiff must allege particular facts giving rise to a strong inference that the defendant acted in a severely reckless manner." *Theoharous*, 256 F.3d at 1224 (quoting *Bryant*, 187 F.3d at 1287). "Thus, beyond the who, what, when, where, and how of the alleged fraud, a complaint pleading securities fraud must now also plead the mens rea of the cause of action with speci-

ficity." *In re Unicapital Corp. Securities Litig.*, 149 F.Supp.2d at 1370. As stated above, the rule of this Circuit is that a showing of "severe recklessness" satisfies the scienter requirement. *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir.1989).

Plaintiffs place emphasis on the allegations that Defendants violated certain GAAP Specifically, the Complaint alleges that Defendants prematurely recognized $2 million of revenue from the ToyTime transaction in the fourth quarter of 1999, prior to the completion of the installation of the system, in contravention to Statement of Position 91–1, *Software Revenue Recognition* ("SOP 91–1"), Statement of Position 97–2, *Software Revenue Recognition* ("SOP 97–2") and Accounting Research Bulletin ("ARB") No. 45, *Long–Term Construction–Type Contracts*. *See* Amended Complaint ¶¶ 30–35. The Amended Complaint also alleges that Defendants belatedly took a $1.2 million reserve on May 25, 2000 for the uncollectible ToyTime receivable, although Defendants knew or recklessly disregarded that the receivable was uncollectible as early as March 2000, in violation of the Accounting Principles Board Opinion Nos. 10 and 12. *See id.* ¶¶ 48–53. Additionally, the Amended Complaint alleges that Defendants failed to disclose that Smith Gardner was exposed to a significant credit risk in connection with the ToyTime receivable, in contravention to FASB Statement 105, *Disclosure of Information about Financial Instruments with Off–Balance–Sheet Risk and Concentrations of Credit Risk.* *See id.* ¶ 55.

■ Violations of GAAP, without more, may establish negligence but do not establish scienter under Rule 10b–5 and the Reform Act. *See Reiger v. Price Waterhouse Coopers LLP,* 117 F.Supp.2d 1003, 1009 (S.D.Cal.2000); *Echavarri,* Case No. 99–1502, slip op. at 24 ("accounting irregularities and/or violations of GAAP alone are insufficient to create a strong inference of scienter"). Such violations provide evidence of scienter only when accompanied by additional facts and circumstances that raise an issue of fraudulent intent. *Reiger,* 117 F.Supp.2d at 1009. Thus, in certain circumstances, courts have held that allegations of violations of GAAP, coupled with ignoring "red flags" or warning signs of improprieties, can be sufficient to state a claim of securities fraud. *In re Hamilton Bancorp, Inc. Securities Litig.,* Case No. 01–0156–Civ–Gold, slip. op. at 10 (S.D.Fla. Jan. 14, 2002) (citing *Ziemba,* 256 F.3d at 1210).

■ In the instant matter, however, Plaintiffs fail to allege that Defendants were confronted with adverse material facts or red flags putting them on notice of any improprieties. There are insufficient facts suggesting awareness by Defendants either that their alleged method of revenue recognition violated GAAP or that ToyTime would be unable to pay the receivable. In the first place, Defendants' alleged violations of GAAP at best would constitute gross negligence, rather than the severe recklessness demanded for scienter. *See e.g., Ziemba,* 256 F.3d at 1210. Arguably, Plaintiffs are alleging a claim based on Defendants' business judgment concerning the timing of revenue recognition.

Second, Plaintiffs argue that a reasonable inference can be made that Defendants became privy to information that the receivable would not be collectible well before the May 24, 2000 meeting between ToyTime and its creditors. However, merely to assume that Smith Gardner received prior notice of this meeting is insufficient. Plaintiffs also allege that Smith Gardner should have received $1,000,000 from ToyTime in January 2000, and did

not do so. However, Plaintiffs provide no basis for this allegation other than the assertion that Smith Gardner typically received an initial deposit equal to 25% of the contract price at the time of execution and another 25% prior to installation. As the Eleventh Circuit stated in *Ziemba*, there are no "tips, letters or conversations that the [defendant] company knew about the [alleged] fraud or was severely reckless in not knowing about the fraud." *Id.* In the instant case, there are no tips, letters or conversations that Defendants knew about ToyTime's difficulties months before the May 24, 2000 meeting, or was severely reckless in not knowing about the financial difficulties. Furthermore, even if, as Plaintiffs assert, ToyTime had run out of money by April 2000, this does not mean that it necessarily had no ability to generate revenues or make future payments to its creditors from such revenues. *See Echavarri*, Case No. 99–1502–Civ–Gold, slip op. at 14. Instead, Plaintiffs rely on vague, conclusory assertions that Defendants knew that Smith Gardner would be unable to collect the receivable from ToyTime. Mere allegations that Defendants held senior management positions, had access to inside information, and therefore must have known of the falsity of certain statements is insufficient to plead scienter. *See e.g., Cheney*, 2000 WL 1140306, at *9 (reiterating that a strong inference of scienter is not raised simply because individual defendants held positions of control, were involved in day-to-day activities, and signed SEC filings). As noted above, the Reform Act requires that a complaint state with particularity facts giving rise to a strong inference that each separate defendant acted with scienter with respect to each act or omission alleged. *In re Sunbeam Securities Litig.*, 89 F.Supp.2d at 1341. This has not been done in the instant matter.

In support of their scienter allegations, Plaintiffs also point to "motive and opportunity" as additional evidence to establish a strong inference of scienter. Specifically, Plaintiffs point to the stock sales by the individual Defendants during the class period at issue.

As Plaintiffs acknowledge, this Circuit has held that allegations of motive and opportunity to commit fraud, standing alone, are insufficient to establish scienter in this Circuit. *See Bryant*, 187 F.3d at 1285. However, coupled with other evidence, sales of stock by insiders in suspicious amounts or at suspicious times is probative of scienter. *See Securities and Exchange Commission v. Adler*, 137 F.3d 1325, 1340 (11th Cir.1998) (citation omitted). Plaintiffs assert that Defendants collectively sold more than 262,000 shares of Smith Gardner stock at an average price of $18.80 for proceeds exceeding $4.5 million during the class period at issue. *See* Pl. Opp'n at 23–24; Amended Complaint ¶¶ 81, 86. Specifically, Defendant Gardner sold 100,000 shares, representing 4.44% of his total holdings. Defendant Smith also sold 100,000 shares during that same period, representing 4.44% of his total holdings. Defendant Hegna sold 50,000 shares, representing 11.26% of his total holdings. Finally, Defendant Weinbaum sold 12,500 shares, representing 38.74% of his holdings. *See* Pl. Opp'n at 24; Amended Complaint ¶ 81. Plaintiffs assert that these transactions occurred between February 9, 2000 and March 9, 2000. *See id.*

In determining whether stock sales are unusual or suspicious, a court may look to: (1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) the consistency between the sales and the insider's prior trading history. *See In re Splash Technology Holdings, Inc. Securities Litig.*, 2000 WL 1727377, at *22 (N.D.Cal.2000). The Court

is not persuaded that the timing of these sales is suspicious and thus probative of scienter. First, Plaintiffs have failed to allege facts supporting their allegations that Defendants became aware of or recklessly disregarded ToyTime's financial difficulties as early as February or March of 2000, when the stock sales were made. Second, Plaintiffs fail to provide the trading history for each Defendant. It is unclear whether the trades made by the individual Defendants during the class period were routine or extraordinary. The Court is being asked to assess this information in a vacuum.

Second, with regard to the amount and percentage of the shares sold, Defendants argue that a mere 4.5% of the individual Defendants' total shares were sold. This argument is slightly illusory as it does not indicate the percentage of shares sold for each individual Defendant. As stated above, Defendants Gardner and Smith each sold approximately 4.44% of their total holdings, while Defendant Hegna sold 11.26% of his shares and Defendant Weinbaum sold 38.74% of his total holdings. Obviously, while selling a greater amount of shares, Gardner and Smith still sold a relatively small portion of their total holdings. Arguably, the larger percentages of stock sales by Defendants Weinbaum and Hegna might be more suspicious. *See id.*, 2000 WL 1727377, at *23 (finding that percentages of stock sales ranging from 25.17% to 47.37% were suspicious); *see also Ronconi v. Larkin*, 253 F.3d 423, 2001 WL 609520, at *8 (9th Cir.2001) (finding that percentages of stock sales totaling 10% and 17% were not suspicious); *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.*, 927 F.Supp. 1297, 1313 (C.D.Cal.1996) (finding that selling 20% of stock holdings may be suspicious). However, as one court has stated, there are many reasons why the individual Defendants may have sold the stock. *See In re Theragenics Corp. Securities Litig.*, 105 F.Supp.2d at 1361. In this instance, additional factual support for the existence of scienter is lacking. Plaintiffs' allegations raise only issues of motive and opportunity, which this Circuit has held are insufficient, without more, to raise a strong inference of scienter.

Accordingly, the Court finds that the Complaint fails to articulate with particularity facts that give rise to a strong inference that the individual Defendants acted with the required state of mind.

## III. Safe Harbor

 Defendants also move to dismiss on the ground that the statements contained in the February 3, 2000 and May 25, 2000 press releases are forward-looking and are thus protected by the safe harbor provision of the PSLRA. Defendants argue that each of the press releases contained a disclaimer identifying certain information in the statement as forward-looking and stating that results may differ from management's expectations. *See* Defs. Mem. Supp. Mot. Dismiss at 28. Additionally, Defendants argue that the Amended Complaint does not allege facts giving rise to a strong inference that the statements were made with actual knowledge by Defendants that said statements were false. *See id.* Plaintiffs counter that the statements made were not forward-looking, but all relate to historical or then-existing facts and conditions. *See* Pl. Opp'n at 28. Plaintiffs further assert that said statements were not accompanied by meaningful cautionary language, and that the statements are false and misleading. *See id.* at 29–30.

The Reform Act's safe harbor provision protects forward-looking statements from serving as a basis for liability in private securities fraud suits if the statements

qualify as forward-looking under 15 U.S.C. §§ 78u–5(i)(1)(A)–(F)[3], and meet any one of the statutory conditions set forth in 15 U.S.C. §§ 78u–5(c)(1)(A)–(B)[4]; *Bryant,* 187 F.3d at 1276 n. 7. Forward looking statements include a statement containing a projection of revenues, a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer, a statement of future economic performance, and any statement of the assumptions underlying or relating to the aforementioned statements. *See* 15 U.S.C. § 78u–5(i)(1); *Harris,* 182 F.3d at 804. This Circuit has clarified that in assessing whether statements are subject to the forward-looking safe harbor provision, a line or paragraph referenced in a complaint must be viewed in the context in which it was made, rather than standing alone as presented in the complaint. *Id.* at 806–07.

Plaintiffs argue that the financials reflected in the press releases reflect the past and then current condition of Smith Gardner and are not forward looking. With respect to the February 3, 2000 press release, the Court agrees. Said press release consists not of economic forecasts but instead of comments and analyses on Smith Gardner's past or current performance. *See* Amended Complaint ¶ 40; Defs. Ex. 25. It therefore does not constitute a forward looking statement. *See In re Sunbeam Securities Litig.,* 89 F.Supp.2d at 1339 (stating that the statutory safe harbor does not protect Defendants from liability based on statements that misrepresent historical or current factors). For statements that are not forward-looking, Plaintiffs must allege partic-

---

**3.** 15 U.S.C. §§ 78u–5(i)(1)(A)–(F) provides:

The term "forward-looking statement" means—
(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

**4.** 15 U.S.C. §§ 78u–5(c)(1)(A)–(B) provides:

Except as provided in subsection (b) of this section, in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) of this section shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—
(A) the forward-looking statement is—
(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
(ii) immaterial; or
(B) the plaintiff fails to prove that the forward-looking statement—
(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
(ii) if made by a business entity; was—
(I) made by or with the approval of an executive officer of that entity; and
(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

ular facts giving rise to a strong inference that Defendants acted in a severely reckless manner. *See Theoharous*, 256 F.3d at 1224 (citation omitted). For the reasons discussed above, *see supra* pp. 1301–1304, the Court finds that Plaintiffs have failed to allege particular facts giving rise to a strong inference that Defendants acted with the requisite state of mind.

█ The May 25, 2000 press release however, contains a mixture of prognostications and comments on Smith Gardner's past performance. *See* Amended Complaint ¶ 65; Defs. Ex. 26. "If a review of the entire statement, as opposed to an isolated line or two, reveals that it is a mixed statement (i.e., it contains historical observations and prognostications based upon those observations), the entire statement qualifies as forward looking for the purposes of the PSLRA's safe harbor provision." *In re Unicapital Corp. Securities Litig.*, 149 F.Supp.2d at 1374. The Court finds that the May 25, 2000 press release quoted in the Amended Complaint is a mixed statement and thus should be considered as a forward looking statement eligible for the safe-harbor provision.

█ It then must be determined whether the press release is protected from liability by the safe harbor provision. *See id.* To be exempt from liability, the press release must have been: (1) identified as forward looking and; (2) accompanied by meaningful cautionary language identifying factors that could materially affect the prognostications. *See id.;* 15 U.S.C. § 78u–5(c)(1)(A)(i). To qualify as meaningful cautionary language, a statement's warning must advise investors of "risks of a significance similar to that actually realized." *Harris*, 182 F.3d at 807. "[T]he warning need not explicitly describe the particular happenings that ultimately come to pass, but it must be sufficient to put a reasonable investor on notice of the potential that something similar to those happenings could occur." *In re Unicapital Corporation Securities Litig.*, 149 F.Supp.2d at 1375.

Defendants assert that the press releases at issue contained a disclaimer identifying certain information in the statements as forward-looking and directing the reader to the risks set forth in Smith Gardner's prospectus dated January 29, 1999[5] and Forms 10–K and 10–Q.[6] The Court notes

---

5. The January 29, 1999 Prospectus states that an investment in the company's shares of common stock involves a "high degree of risk." The Prospectus further advises of various risks associated with the marketing and sale of the company's applications software, fluctuations in quarterly performance, and general economic conditions which "may cause clients and potential clients to delay, cancel or reduce any planned expenditures for the Company's software products and services."
*See* Defs. Ex. 24 at 7–8.

6. The March 31, 2000 Form 10–Q, filed May 10, 2000, contains the following provision:
Forward Looking Statements
Certain matters discussed in this Form 10–Q may be "forward looking statements" as defined in the Private Securities Litigation Reform Act of 1995, including but not limit-

ed to statements related to plans for future business development activities, anticipated costs of revenues, product mix and service revenues, research and development and selling, general and administrative activities, and liquidity and capital needs and resources. Such forward-looking statements are subject to risks, uncertainties and other factors, which could cause actual results to differ materially from future results expressed or implied by such forward-looking statements. Investors are cautioned that any forward-looking statements are not guarantees of future performance and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward looking statements.
*See* Pls. Opp'n, Ex. A at 12.

that the statute requires the warning only to mention important factors that could cause actual results to differ materially from those in the forward looking statement. *See* 15 U.S.C. § 78u–5(c)(1)(A)(i). It does not require a listing of all factors or a specification of the particular factors that ultimately causes the forward-looking statement not to come true. *See In re Unicapital Securities Litig.*, 149 F.Supp.2d at 1375. The Court finds that the warnings at issue perhaps constitute little more than generic, boilerplate language but still meet the requirements of meaningful cautionary language. Nonetheless, even if this Court were to assume *arguendo* that the May 25, 2000 press release was not immunized by meaningful cautionary language, Defendants, however, would still be shielded from liability if Plaintiffs fail to plead with particularity facts giving rise to a strong inference that Defendants had actual knowledge of the falsity of the statements when made. *See Harris*, 182 F.3d at 803 (stating that under the Reform Act, "even if the forward-looking statement has no accompanying cautionary language, the plaintiff must prove that the defendant made the statement with actual knowledge that it was false or misleading"); *In re Columbia Laboratories, Inc. Securities Litig.*, Case No. 00–2112–Civ–King, slip op. at 7, 10 (S.D.Fla. May 9, 2001). The Court finds that the Amended Complaint fails to allege any particularized facts that Defendants knew the statements were false when made. Instead, Plaintiffs make unsupported, conclusory assertions that Defendants must have known that Smith Gardner would not be able to collect on the ToyTime receivable.

### IV. Controlling Person Claim

Plaintiffs' Second Claim for Relief in the Amended Class Action Complaint asserts a claim for controlling person liability under § 20(a) of the Exchange Act against the individual Defendants. However, in the absence of a viable Section 10(b) or Rule 10b–5 claim, an action against controlling individuals pursuant to Section 20(a) cannot be maintained. *See In re Republic Services, Inc. Securities Litig.*, 134 F.Supp.2d at 1363.

### CONCLUSION AND RECOMMENDATION

For the foregoing reasons, it is RESPECTFULLY RECOMMENDED that Defendants' Motion to Dismiss [DE# 20] be GRANTED, and that Plaintiff's Consolidated Amended Class Action Complaint be DISMISSED WITHOUT PREJUDICE. Plaintiffs have failed to sufficiently allege with particularity the underlying accounting fraud and misrepresentation by Defendants. Plaintiffs also have failed to allege with the requisite particularity facts giving rise to a strong inference that Defendants acted with scienter.

The parties have ten (10) days from the date of this Report and Recommendation to file written objections, if any, with the Honorable Shelby Highsmith, United States District Judge. *See* 28 U.S.C. § 636 (1991). Failure to file timely objections may bar the parties from attacking on appeal the factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745, 750 (11th Cir.), *cert. denied*, 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988).

Feb. 5, 2002.